IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| TRACIE EAVES PENEGAR, | : | CASE NO. 19-55285-pmb |
| *dba Lillie Blu Designs* | : | |
| *dba Lizard Thicket* | : | CHAPTER 7 |
| *dba Tracing Tracie* | : | |
| | : | |
| Debtor. | : | |
| | : | |
| | : | |

| | | |
|---|---|---|
| HOME POINT FINANCIAL SERVICES, | : | |
| | : | |
| Movant. | : | |
| | : | |
| vs. | : | |
| | : | |
| TRACIE EAVES PENEGAR, | : | |
| *dba Lillie Blu Designs* | : | |
| *dba Lizard Thicket* | : | |
| *dba Tracing Tracie*, | : | |
| KATHLEEN STEIL, Trustee, | : | |
| | : | |
| Respondents. | : | |

## NOTICE OF MOTION TO ALLOW LOAN MODIFICATION

Movant has filed documents with the court to allow a Loan Modification.

**YOUR RIGHTS MAY BE AFFECTED. You should read these documents carefully and discuss them with your attorney, if you have one in this bankruptcy case. If you do not have an attorney, you may wish to consult one.**

If you do not want the court to allow a loan modification or if you want the court to consider your views on the motion, then you or your attorney shall attend the hearing scheduled to be held on

**November 18, 2019 at 2:00 P.M. at the United States Bankruptcy Court, Courtroom 1202, 75 Ted Turner Dr SW, Atlanta, GA 30303.**

If you or your attorney does not take these steps, the court may decide that you do not oppose the relief sought in the motion and may enter an order allowing the loan modification.

You may also file a written response to the pleading with the Clerk at the address stated below, but you are not required to do so. If you file a written response, you must attach a

certificate stating when, how and on whom (including addresses) you served the response. Send your response so that it is received by the Clerk at least two business days before the hearing.

The address of the Clerk's Office is: **Clerk, United States Bankruptcy Court, 75 Ted Turner Drive SW, Suite 1340, Atlanta, Georgia 30303.** You must also send a copy of your response to the undersigned at the address stated below.

Dated this _____ 10/29/2019 _____

*/s/A. Michelle  Hart Ippoliti*
A. Michelle  Hart Ippoliti, GEORGIA BAR NO. 334291
Attorney for Movant
McCalla Raymer Leibert Pierce, LLC
1544 Old Alabama Road
Roswell, Georgia 30076
678-281-6537
Michelle.HartIppoliti@mccalla.com

IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| TRACIE EAVES PENEGAR, | : | CASE NO. 19-55285-pmb |
| *dba Lillie Blu Designs* | : | CHAPTER 7 |
| *dba Lizard Thicket* | : | |
| *dba Tracing Tracie* | : | |
| | : | |
| Debtor. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| HOME POINT FINANCIAL SERVICES, | : | |
| | : | |
| Movant. | : | |
| | : | |
| vs. | : | |
| | : | |
| TRACIE EAVES PENEGAR, | : | |
| *dba Lillie Blu Designs* | : | |
| *dba Lizard Thicket* | : | |
| *dba Tracing Tracie*, | : | |
| KATHLEEN STEIL, Trustee, | : | |
| | : | |
| Respondents. | : | |

## MOTION TO ALLOW LOAN MODIFICATION AND COMPEL TRUSTEE TO ABANDON DEBTOR'S REAL PROPERTY

COMES NOW Movant to files this Motion to Allow Loan Modification, and shows this

Court the following:

1.

This is a Motion to allow the parties to enter into a loan modification. Movant seeks an

Order allowing the loan modification to which the parties have agreed.  Additionally, Movant

requests that the Trustee abandon Debtor's real property if it is of no benefit to the Debtor's

Estate.

2.

Movant services a loan on property known as 1860 Cedar Cliff Dr SE, Smyrna, Georgia

30080-5884.

3.

According to Debtor's schedules, the Property is valued at $395,480.00 and is subject to Movant's mortgage and also a junior lien, held by Vinings Bank, in the approximate amount of $220,000.00.  Movant's estimated payoff on its unmodified mortgage is $ 302,800.00.  Based on the foregoing, there does not appear to be equity in the Property to benefit the Estate.

4.

On or about September 30, 2019,  the parties agreed to modify the loan. A copy of said agreement is attached.  **Said loan modification will have a new principal balance of $304,438.64 with a fixed interest rate of 3.875%**.  **The initial estimated monthly modified payment shall be $1,838.12**, comprised of principal and interest in the amount of $1,248.80 and current monthly escrow collection currently comprised of $589.32.  The maturity date of the modified loan will be October 1, 2059. The amount of arrearages to be capitalized in the modification is $14,675.28.

5.

**Prior to the Modification, the Principal Balance is/was $289,763.36, at an interest rate of 3.875%.**  The payment amount, prior to the Modification, consists/consisted of a principal and interest payment of $1,443.63, and an escrow payment of $700.01, for a **total prior payment of $2,143.64**. Additionally, the loan prior to modification is/was due for the December 1, 2018 payment and the original maturity date was November 1, 2045.

6.

The parties believe that this Agreement is in the Debtor's best interest, and Movant seeks an Order allowing the modification, including, but not limited to, the execution and recording of the finalized loan modification agreement and any other related documents.

7.

The parties agree that the loan modification will not affect the discharge of borrower's personal liability on the Note, unless the borrower also enters into a reaffirmation agreement on the Note.

WHEREFORE, Movant prays

(a)     That its Motion be granted so as to permit the Movant and Debtor(s) to enter into the loan modification agreement previously described and attached to this Motion;

(b)     For an order compelling Trustee to file a Notice of Abandonment of the Property within 15 calendar days if it is of no benefit to the Estate, if not done so already;

(c)     That the Movant, at its option, be permitted to contact the Debtor(s) via telephone or written correspondence regarding this modification and/or any other potential loan workout or loss mitigation agreement;

(d)     For such other and further relief that is just and proper.


*/s/A. Michelle  Hart Ippoliti*
A. Michelle  Hart Ippoliti, GEORGIA BAR NO. 334291
Attorney for Movant
McCalla Raymer Leibert Pierce, LLC
1544 Old Alabama Road
Roswell, Georgia 30076
678-281-6537
Michelle.HartIppoliti@mccalla.com

BANKRUPTCY CASE NO. 19-55285-pmb

CHAPTER  7

CERTIFICATE OF SERVICE

I, A. Michelle  Hart Ippoliti, of McCalla Raymer, LLC, 1544 Old Alabama Road, Roswell, Georgia  30076-2102, certify:

That on the date below, I served a copy of the within NOTICE OF ASSIGNMENT OF HEARING, together with the MOTION TO ALLOW LOAN MODIFICATION AND COMPEL TRUSTEE TO ABANDON DEBTOR'S REAL PROPERTY filed in this bankruptcy matter on the following parties at the addresses shown, by regular United States Mail, postage prepaid, unless another manner of service is expressly indicated:

Tracie Eaves Penegar
1860 Cedar Cliff Dr.
Smyrna, GA 30080

Ira D. Gingold                                  *(served via ECF notification)*
Gingold & Gingold LLC
Suite 385
1718 Peachtree Street NW
Atlanta, GA 30309

Kathleen Steil                                  *(served via ECF notification)*
Kathleen Steil, Trustee
Ogier, Rothschild &
Rosenfeld, PC
P. O. Box 1547
Decatur, GA 30031

I CERTIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on     10/29/2019     By:     */s/ A. Michelle  Hart Ippoliti*
                     (date)                          A. Michelle  Hart Ippoliti, GEORGIA BAR NO. 334291
                                                     Counsel for Movant

**TAX ID NO.** ▮▮▮▮▮
**After Recording Return To:**
RUTH RUHL, P.C.
Attn: Recording Department
12700 Park Central Drive, Suite 850
Dallas, Texas 75251
**This Instrument was Prepared By:**
RUTH RUHL, P.C.
Ruth Ruhl, Esquire
12700 Park Central Drive, Suite 850
Dallas, Texas 75251
and Co-Counsel, PC Law Associates, LLC
Kenneth N. Smolar, Esquire
200 Fleet Street, Suite 6100
Pittsburgh, Pennsylvania 15220
Georgia Bar ID: ▮▮▮▮▮

_____[Space Above This Line For Recording Data]_____

Loan No.: ▮▮▮▮▮
Freddie Mac Loan No.: ▮▮▮▮▮

# LOAN MODIFICATION AGREEMENT

This Loan Modification Agreement ("Agreement"), between   Tracie E Penegar, a single person, whose address is 1860 Cedar Cliff Dr SE, Smyrna, Georgia 30080

("Borrower")

and Home Point Financial Corporation, whose address is 11511 Luna Road, Suite 200, Farmers Branch, Texas 75234

("Lender"),

is effective September 30th, 2019            , and amends and supplements (1) the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated October 13th, 2015 and recorded Book/Liber 15292            , Page 3583            , Instrument No. D2015-093601            , of the Official Records of  Cobb            County, Georgia            , and (2) the Note bearing the same date as, and secured by the Security Instrument, which was entered into as security for the performance of the Note and encumbers the real and personal property described and defined in the Security Instrument as the "Property," located at 1860 Cedar Cliff Dr SE, Smyrna, Georgia 30080

**Georgia State Code: 48-6-65:**  Intangible recording tax is not required to be paid on any instrument that modifies by extension, transfer, assignment, or renewal, or gives additional security for an existing note, when the intangible recording tax has been paid on the original security instrument or the holder of the original instrument was exempt.

**The original principal balance was $307,000.00. The existing principal balance is $289,763.36. $14,675.28 will be added to the existing principal balance resulting in a new unpaid principal balance of $304,438.64. The portion of the Unpaid Principal Balance which is subject to mortgage registry tax is $0.00."**

Loan No.: 

the real property described being set forth as follows:
SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

In consideration of the agreements made in this Agreement, and other good and valuable consideration which the parties agree they have received, including, but not limited to avoiding foreclosure and its related costs, the Borrower and Lender agree to modify the terms of the Note and Security Instrument (the "Loan Documents") as set forth in this Agreement. The Borrower and the Lender also agree that the provisions of this Agreement supersede and replace any inconsistent provisions set forth in the Loan Documents and any prior modification, forbearance or other loss mitigation agreement.

1. **BORROWER REPRESENTATIONS AND COVENANTS**. I certify and represent to Lender and otherwise agree and covenant with Lender that:

(a) I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents or my default is imminent, and (ii) I do not have sufficient income or access to sufficient readily available financial assets to make my monthly mortgage payments now or in the near future;

(b) There has been no impermissible change in the ownership of the Property since I signed the Loan Documents;

(c) I have provided required documentation for all income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify mortgage assistance);

(d) All documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for this modification, are true and correct;

(e) I have made or will make all payments required under a trial period plan and have complied with all other requirements of such trial period plan; and

(f) I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Lender's procedures to ensure that my mortgage loan as modified by this Agreement is in first lien position and is fully enforceable upon modification and that if, under any circumstance and notwithstanding anything else to the contrary in this Agreement, the Lender does not receive such title endorsement(s), title insurance product(s) and/or subordination agreement(s), then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void.

2. **ACKNOWLEDGEMENTS AND PRECONDITIONS TO MODIFICATION**. I understand and acknowledge that:

(a) If, prior to or as of the Modification Effective Date, the Lender determines that any of my certifications or representations set forth in paragraph No.1 is untrue or any covenant or agreement set forth above in paragraph No.1 has not been performed, the Loan Documents will not be modified and this Agreement, except for this paragraph is null and void and of no legal effect; and

(b) The Loan Documents will not be modified by this Agreement unless and until both (i) the Lender has accepted this Agreement as solely evidenced by Lender's signature on this Agreement or on a copy of this

Loan No ████████

Agreement containing Lender's signature, and (ii) the Modification Effective Date has occurred and the Lender will not be obligated or bound to make any modification of the Loan Documents if any certification or representation set forth above in paragraph No.1 is untrue or any covenant or agreement set forth above in paragraph No.1 has not been performed.

### 3. CAPITALIZATION AMOUNT.
I acknowledge that interest has accrued but has not been paid and the Lender also has incurred, paid or otherwise advanced taxes, insurance premiums and other expenses necessary to protect or enforce its interest in the Loan Documents and that such interest, costs and expenses, in the total amount of $ 14,675.28 have been added to the principal balance owed under the Note and secured by the Security Instrument.

### 4. UNPAID PRINCIPAL BALANCE.
As of  October 1st, 2019    the amount payable under the Loan Documents is U.S. $ 304,438.64 (the "Unpaid Principal Balance"), consisting of the unpaid amount(s) loaned to Borrower by Lender plus the Capitalization Amount set forth in paragraph No.3.

### 5. BORROWER'S PROMISE TO PAY.
I promise to pay the Unpaid Principal Balance plus interest charged in accordance with paragraph No.6 to the order of Lender in accordance with the payment schedule set forth in paragraph No.7.

### 6. INTEREST.
Interest will be charged on the Unpaid Principal Balance at the yearly rate of  3.875    % beginning on October 1st, 2019    . The yearly rate of  3.875  % will remain in effect until principal and interest are paid in full.

### 7. MONTHLY PAYMENTS AND DUE DATE.
I promise to make monthly payments of principal and interest as set forth in the schedule below until the principal and interest and any other amounts secured by the Security Instrument are paid in full. My payment schedule for the modified Loan is as follows:

| Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins On | Number of Monthly Payments |
|---|---|---|---|---|---|---|
| 3.875% | 10/01/2019 | $1,248.80 | $589.32 , may adjust periodically | $1,838.12 , may adjust periodically | 11/01/2019 | 480 |

*The monthly escrow payment amount may be adjusted periodically in accordance with applicable law and therefore I understand that my total monthly payment may change accordingly.

### 8. MATURITY DATE.
If on October 1st, 2059      (the "Maturity Date"), I still owe amounts under the Loan Documents, as amended by this Agreement, I will pay these amounts in full on the Maturity Date.

### 9. TRANSFER OF THE PROPERTY OR BENEFICIAL INTEREST IN BORROWER.
As used in this paragraph, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future

Loan N█████████████

date to a purchaser or other third party.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed and, within such period, Borrower must pay all sums secured by the Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower.

## 10. SECURITY INSTRUMENT.

I will comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of the Security Instrument, including without limitation, my covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that Borrower is obligated to make under the Security Instrument; however, the following terms and provisions are forever canceled, null and void, as of the date specified in paragraph No.4:

(a) all terms and provisions of the Loan Documents (if any) providing for, implementing, or relating to, adjustable, step or simple rate of interest payable under the Note; and

(b) all terms and provisions of any adjustable rate rider, or other instrument or document that is affixed to, wholly or partially incorporated into, or is part of, the Loan Documents and that contains any such terms and provisions as those referred to in paragraph No.10(a).

## 11. ADDITIONAL AGREEMENTS. I understand and agree that:

(a) Funds for Escrow Items. I will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items." I shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. I shall pay Lender the Funds for Escrow Items unless Lender waives my obligation to pay the Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and I shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, I shall pay to Lender all Funds, and in such amounts, that are then required under this paragraph.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the

Loan No.

Escrow Items, unless Lender pays me interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay me any interest or earnings on the Funds. Lender and I can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide me, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to me for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to me any Funds held by Lender.

(b) **Default**. I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement; that all the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument also apply to default in the making of the payments due under this Agreement; and that I will be in default if, during the loss mitigation application process, I or any persons or entities acting at my direction or with my knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with my mortgage loan or application for mortgage assistance, such material representations include, but are not limited to, representations concerning my income, hardship, Property, and occupancy of the Property;

(c) **Loan Documents Remain in Full Force and Effect Except as Modified**. All covenants, agreements, stipulations, and conditions in the Loan Documents shall be and remain in full force and effect, except as modified by this Agreement, and none of the Borrower's obligations or liabilities under the Loan Documents shall be diminished or released by any provisions of this Agreement, nor shall this Agreement in any way impair, diminish, or affect any of Lender's rights under or remedies on the Loan Documents, whether such rights or remedies arise thereunder or by operation of law. Also, all rights of recourse to which Lender is presently entitled against any property or any other persons in any way obligated for, or liable on, the Loan Documents are expressly reserved by Lender. The Loan Documents as modified by this Agreement are duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed;

(d) **Debt is not Satisfied or Released**. Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Loan Documents;

(e) **Modification Costs and Expenses of Lender**. I agree that all costs and expenses incurred by Lender in connection with this Agreement, including recording fees, title examination, and attorney's fees, shall be paid by the Borrower and shall be secured by the Security Instrument, unless stipulated otherwise by Lender;

(f) **Assignment of Agreement**. I understand that I may not assign the Loan Documents or this Agreement to a buyer or transferee of the Property and, unless expressly agreed to by Lender in writing, such buyer or transferee will not be permitted to assume the Loan;

(g) **Execution of Documents**. I agree to make and execute such other documents or papers as may be necessary or required to consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Agreement if an error is detected after execution of this agreement and which, if approved and accepted by Lender, shall bind and inure to the heirs, executors, and administrators, of the Borrower or the Borrower's estate. I understand that either a corrected Agreement or a letter agreement containing the correction will be provided to me for my signature. At Lender's option, this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under any of Lender's available modification programs. Borrower represents that all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i)

Loan No.: Loan No. ███████████

a borrower or co-borrower is deceased; (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing;

(h) **MERS**. Mortgage Electronic Registration Systems, Inc. ("MERS") is a separate corporation organized and existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS. If my loan has been registered with MERS, I understand and agree that MERS has only legal title to the interests granted by the Borrower under the Loan Documents and this Agreement and MERS is acting solely as nominee for Lender and Lender's successors and assigns, and as such, MERS has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling the mortgage loan;

(i) **Lost or Destroyed Documents**. That if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the Loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. If the Note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the Note. All documents the Lender requests of me under this paragraph shall be referred to as "Documents." I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement;

(j) **Mortgage Insurance Premiums**. That the mortgage insurance premiums on my Loan, if applicable, may increase as a result of the Capitalization Amount which will result in a higher total monthly payment. Furthermore, the date on which I may request cancellation of mortgage insurance may change as a result of the New Unpaid Principal Balance; and

(k) **Consent to Disclosure of Information**. Borrower authorizes Lender, and Lender's successors and assigns, to share Borrower information including, but not limited to (i) name, address, and telephone number, (ii) Social Security Number, (iii) credit score, (iv) income, (v) payment history, (vi) account balances and activity, including information about any modification or foreclosure relief programs, with Third Parties that can assist Lender and Borrower in obtaining a foreclosure prevention alternative, or otherwise provide support services related to Borrower's loan. For purposes of this paragraph, Third Parties include a counseling agency, state or local Housing Finance Agency or similar entity, any insurer, guarantor, or servicer that insures, guarantees, or services Borrower's loan or any other mortgage loan secured by the Property on which Borrower is obligated, or to any companies that perform support services to them in connection with Borrower's loan. Borrower consents to being contacted by Lender or Third Parties concerning mortgage assistance relating to Borrower's loan at any telephone number, including mobile telephone number, or email address Borrower has provided to Lender or Third Parties.

[ ] By checking this box, Borrower also consents to being contacted by text messaging.

Loan No.:

Date __10/8/19__

_____ (Seal)
Tracie E Penegar                —Borrower

Date _____

_____ (Seal)
                               —Borrower

Date _____

_____ (Seal)
                               —Borrower

Date _____

_____ (Seal)
                               —Borrower

## BORROWER ACKNOWLEDGMENT

State of __GA__

County of __Cobb__                ss:

Signed, sealed and delivered in the presence of:

_____
Unofficial Witness

(Seal)  A RENEE ORR
Notary Public, Georgia
Cobb County
My Commission Expires
June 03, 2023

_____
Notary Public

My Commission Expires: __06/03/2023__

ACKNOWLEDGEMENT (GEORGIA)                                    Page 7 of 8
                                                              08/19

Loan No ███████

Home Point Financial Corporation
—Lender

10-10-2019
-Date

By: _Regi Bmaich_

Its: _SR. Director_

## LENDER ACKNOWLEDGMENT

State of _Texas_

County of _Dallas_          ss:

Signed, sealed and delivered in the presence of:

_____
Unofficial Witness

(Seal)

_____
Notary Public

My Commission Expires: 4/4/2022

YESICA TREJO
Notary Public, State of Texas
Comm. Expires 04-04-2022
Notary ID 131617081

ACKNOWLEDGMENT (GEORGIA)                                    Page 8 of 8



Loan No

# NOTICE OF NO ORAL AGREEMENTS

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

**Receipt of Notice:** The undersigned hereby represents and warrants that I/we have each received and read a copy of this Notice on or before the execution of the "Loan Agreement." "Loan Agreement" means one or more promises, promissory notes, agreements, undertakings, security agreements, deeds of trust or other documents, or commitments, or any combination of those actions or documents, pursuant to which a financial institution loans or delays repayment of or agrees to loan or delay repayment of money, goods, or any other thing of value or to otherwise extend credit or make a financial accommodation.

| | |
|---|---|
| _____ | _____ |
| Tracie L Penegar                    -Borrower | -Borrower |

| | |
|---|---|
| _____ | _____ |
| -Borrower | -Borrower |

Loan No.: 

# CORRECTION AGREEMENT

**Borrower(s):** Tracie E Penegar                    **Property:** 1860 Cedar Cliff Dr SE, Smyrna, Georgia 30080

**Words used in this Agreement are defined below. Words in the singular mean and include the plural and vice versa.**

"**Borrower**" is Tracie E Penegar.

"**Lender**" is Home Point Financial Corporation

, and its successors or assigns.
"**Loan**" means the debt evidenced by the Note and all sums due under the Security Instrument.
"**Note**" means the promissory note(s) signed by Borrower in favor of Lender or any assignee of Lender.
"**Security Instrument**" means the Deed of Trust/Mortgage/Security Deed, signed by Borrower in favor of Lender, securing payment of the Note.

AGREEMENT TO CORRECT OR PROVIDE ADDITIONAL DOCUMENTATION OR FEES: **In consideration of the Loan Modification Agreement offered by Lender in the amount of $304,438.64 , which modifies the Note and Security Instrument, and regardless of the reason for any loss, misplacement, omission, misstatement or inaccuracy in any Loan documentation, Borrower agrees as follows: If any document is lost, misplaced, omitted, misstated or inaccurately reflects the true and correct terms and conditions of the Loan, upon request of Lender (including any assignee of Lender), Borrower will comply with Lender's request to execute, acknowledge, initial and/or deliver to Lender any documentation Lender deems necessary to replace and/or correct the lost, misplaced, omitted, misstated or inaccurate document(s). All documents Lender requests of Borrower shall be referred to as "Requested Documents." Borrower agrees to deliver the Requested Documents within ten (10) days after receipt by Borrower of a written request for such replacement. Borrower does hereby agree to comply with Lender's request to assure that the Loan documentation executed this date will enable Lender to seek insurance or guaranty from the Department of Housing and Urban Development (HUD) or Department of Veteran's Affairs (VA), if applicable, or to conform with and be acceptable to the Federal National Mortgage Association (FNMA), Federal Home Loan Mortgage Corporation (FHLMC), Government National Mortgage Association (GNMA), or any other investor.**

REQUEST BY LENDER: **Any request under this Agreement may be made by the Lender (including assignees and persons acting on behalf of the Lender) and shall be prima facie evidence of the necessity for same. A written statement addressed to Borrower at the address indicated in the Loan documentation shall be considered conclusive evidence of the necessity for Requested Documents.**

BORROWER LIABILITY: **If Borrower fails or refuses to execute, acknowledge, initial or deliver the Requested Documents to Lender within ten (10) days after being requested to do so by Lender, Borrower understands that Lender is relying on the representations contained herein and agrees to be liable for any and all loss or damage which Lender reasonably sustains thereby including, but not limited to, all reasonable attorneys' fees and costs incurred by Lender.**

This Agreement shall inure to the benefit of Lender's successors and assigns and be binding upon the heirs, devises, personal representatives, successors and assigns of Borrower.

ACKNOWLEDGMENT OF RECEIPT

**I hereby acknowledge receipt of this Correction Agreement and further acknowledge that I understand its provisions. Words used in this Correction Agreement mean and include the plural and vice versa.**

_____          10/8/19
Tracie E Penegar                        **-Borrower (Date)**          _____
                                                                      **-Borrower (Date)**

_____                                            _____
                        **-Borrower (Date)**                          **-Borrower (Date)**

---

**CORRECTION AGREEMENT**                                              **Page 2 of 2**

Loan No.: 

# ATTORNEY SELECTION NOTICE

By signing below, it is understood and agreed that you may hire a lawyer or attorney to advise you regarding this transaction and its consequences.

SELLER:                                          BORROWER:

_____                      _____
N/A Modification                                 Tracie E Penegar
                        (Date)                                         (Date)


_____                      _____
N/A Modification                                                      (Date)
                        (Date)


_____                      _____
                        (Date)                                         (Date)


_____                      _____
                        (Date)                                         (Date)


ATTORNEY SELECTION NOTICE -MULTISTATE                                Page 1 of 1

*Exhibit A (Legal Description)*

*THE FOLLOWING DESCRIBED PROPERTY LOCATED IN THE COUNTY OF COBB:*

*ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 671 OF THE 17TH DISTRICT, 2ND SECTION, COBB COUNTY, GEORGIA, BEING LOT 66 OF CEDAR CLIFFS SUBDIVISION, UNIT 3, AS PER PLAT THEREOF RECORDED IN PLAT BOOK 122, PAGE 58, COBB COUNTY, GEORGIA RECORDS, WHICH RECORDED PLAT IS INCORPORATED HEREIN BY REFERENCE AND MADE A PART OF THIS DESCRIPTION*

*BEING THE SAME PROPERTY AS CONVEYED BY TRUSTEE'S DEED FILED ON AUGUST 12, 2010, RECORDED IN DEED BOOK 14790, PAGE 1553, COBB COUNTY, GEORGIA, WHICH IS INCORPORATED HEREIN BY REFERENCE.*

*PROPERTY ADDRESS 1860 CEDAR CLIFF DRIVE, SE, SMYRNA, GA 30080*

*MAP PARCEL NUMBER* ▮▮▮▮▮▮▮▮▮▮▮

MIN: ▮▮▮▮▮▮▮▮▮▮▮▮

Loan Number: ▮▮▮▮▮▮

# NOTE

October 13, 2015                                 SMYRNA, GEORGIA

1860 Cedar Cliff Dr SE
SMYRNA, GEORGIA 30080-5884
(Property Address)

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. **$307,000.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Stonegate Mortgage Corporation, an Ohio corporation.** I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **3.875%.**

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the **1st** day of each month beginning on **December 1, 2015.** I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **November 1, 2045,** I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at

**Stonegate Mortgage Corporation
PO BOX 7097
Indianapolis, IN 46207-7097**
or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. **$1,443.63.**

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

---

MULTISTATE FIXED RATE NOTE - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3200   1/01
Page 1 of 3

IDS, Inc.                                                                                 Borrower(s) Initials ▮▮▮▮  ____  ____

MIN [REDACTED]

Loan Number: [REDACTED]

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **FIFTEEN** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000%** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate

---

**MULTISTATE FIXED RATE NOTE** - Single Family - **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
Page 2 of 3

Form **3200**   1/01

IDS, Inc.

Borrower(s) Initials [REDACTED]

MIN: ▮▮▮▮▮▮▮▮▮▮▮▮▮

Loan Number: ▮▮▮▮▮▮▮▮

payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
Tracie E. Henegar                  -Borrower                                          -Borrower
                                                                         *(Sign Original Only)*

Loan originator (organization): **Stonegate Mortgage Corporation**; NMLS # ▮▮▮▮▮▮
Loan originator (organization): **Vinings Bank**; NMLS # ▮▮▮▮▮▮
Loan originator (individual): **Deborah Anne Marinacci**; NMLS # ▮▮▮▮▮▮

MULTISTATE FIXED RATE NOTE - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3200   1/01
                                          Page 3 of 3

DS, Inc.

BK: 15292 PG: 3583-3598
Filed and Recorded Nov-13-2015 09:37:52AM
DOC#: D2015-093601
Georgia Intangible Tax Paid $921.00

*Rebecca Keaton*

REBECCA KEATON
CLERK OF SUPERIOR COURT Cobb Cty. GA.

AFTER RECORDING RETURN TO:
Cutler & Schulman, P.C.
1600 South Cobb Drive, Suite 100
Marietta, Georgia 30060
ATTN: B. Carter
File No. ▮▮▮▮▮▮▮

WHEN RECORDED, MAIL TO:
Nationwide Title Clearing, Attn.: FINAL DOCUMENTS
2100 Alt 19 North
Palm Harbor, FLORIDA 34683

This instrument was prepared by:
Stonegate Mortgage Corporation
9190 Priority Way West Drive, Suite 300
Indianapolis, INDIANA 46240-1437
856-663-5100

_____ [Space Above This Line For Recording Data] _____

# SECURITY DEED

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated October 13, 2015, together with all Riders to this document.

(B) "Borrower" is TRACIE E. PENEGAR, A SINGLE PERSON. Borrower is the grantor under this Security Instrument.

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the grantee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) "Lender" is Stonegate Mortgage Corporation. Lender is an Ohio corporation, organized and existing under the laws of OH. Lender's address is 9190 Priority Way West, Suite 300, Indianapolis, IN 46240-1437.

(E) "Note" means the promissory note signed by Borrower and dated October 13, 2015. The Note states that Borrower owes Lender THREE HUNDRED SEVEN THOUSAND AND NO/100 Dollars (U.S. $307,000.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than November 1, 2045.

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

GEORGIA- Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS                              Form 3011 1/01
Page 1 of 11

IDS, Inc.                                                                                      Borrower(s) Initials _____ _____

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider      ☐ Condominium Rider      ☐ Second Home Rider
☐ Balloon Rider      ☐ Planned Unit Development Rider      ☐ VA Rider
☐ 1-4 Family Rider      ☐ Biweekly Payment Rider
☒ Other [Specify] **Waiver of Borrower's Rights Rider**

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 *et seq.*) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS, with power of sale, the following described property located in the County of Cobb:

     See Attached Exhibit A

     Parcel ID Number:

     which currently has the address of **1860 Cedar Cliff Dr SE**
                            **SMYRNA, GEORGIA 30080-5884,**             .      ("Property Address"):

TO HAVE AND TO HOLD this property unto MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and

GEORGIA- Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS
Page 3 of 11

IDS, Inc.

Form 3011 1/01

Borrower(s) Initials _____

agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed

by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or

forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property (as set forth below). Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, making repairs, replacing doors and windows, draining water from pipes, and eliminating building or other code violations or dangerous conditions. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right

to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property

inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the

following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument**

GEORGIA- Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS                                                                Form 3011 1/01
Page 9 of 11

IDS, Inc.                                                                                                                          Borrower(s) Initials _____

without further demand and may invoke the power of sale granted by Borrower and any other remedies permitted by Applicable Law. Borrower appoints Lender the agent and attorney-in-fact for Borrower to exercise the power of sale. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give a copy of a notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law. Lender, without further demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Lender determines. Lender or its designee may purchase the Property at any sale.

Lender shall convey to the purchaser indefeasible title to the Property, and Borrower hereby appoints Lender Borrower's agent and attorney-in-fact to make such conveyance. The recitals in the Lender's deed shall be prima facie evidence of the truth of the statements made therein. Borrower covenants and agrees that Lender shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The power and agency granted are coupled with an interest, are irrevocable by death or otherwise and are cumulative to the remedies for collection of debt as provided by Applicable Law.

If the Property is sold pursuant to this Section 22, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or such person shall be a tenant holding over and may be dispossessed in accordance with Applicable Law.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waiver of Homestead. Borrower waives all rights of homestead exemption in the Property.

25. Assumption Not a Novation. Lender's acceptance of an assumption of the obligations of this Security Instrument and the Note, and any release of Borrower in connection therewith, shall not constitute a novation.

26. Security Deed. This conveyance is to be construed under the existing laws of the State of Georgia as a deed passing title, and not as a mortgage, and is intended to secure the payment of all sums secured hereby.

BORROWER ACCEPTS AND AGREES to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

IN WITNESS WHEREOF, Borrower has signed and sealed this Security Instrument.

_____ (Seal)         _____ (Seal)
Tracie L. Penegar                          -Borrower                                                  -Borrower

STATE OF GEORGIA, _____COBB_____ County ss:

Signed, sealed and delivered this _13th_ day of _October_, _2015_, in the presence of:

_____
Unofficial Witness

Witness my hand and official seal this _13th_ day of _October_ _2015_

_____
Notary Public, _____COBB_____ County
State of GEORGIA

GEORGIA- Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS                     Form 3011  1/01
Page 11 of 11
IDS, Inc.

## EXHIBIT "A"
## Legal Description

All that tract or parcel of land lying and being in Land Lot 671 of the 17th District, 2nd Section, Cobb County, Georgia, being Lot 66 of Cedar Cliffs Subdivision, Unit 3, as per plat thereof recorded in Plat Book 122, Page 58, Cobb County, Georgia records, which recorded plat is incorporated herein by reference and made a part of this description.

Being the same property as conveyed by Trustee's Deed filed on August 12, 2010, recorded in Deed Book 14790, Page 1553, Cobb County, Georgia, which is incorporated herein by reference.

Property Address: 1860 Cedar Cliff Drive, SE, Smyrna, GA 30080

Map Parcel Number: ████████████████



## WAIVER OF BORROWER'S RIGHTS RIDER

BY EXECUTION OF THIS PARAGRAPH, GRANTOR EXPRESSLY: (1) ACKNOWLEDGES THE **RIGHT TO ACCELERATE** THE DEBT AND THE **POWER OF ATTORNEY** GIVEN HEREIN TO LENDER TO SELL THE PREMISES BY NONJUDICIAL FORECLOSURE UPON DEFAULT BY GRANTOR WITHOUT ANY JUDICIAL HEARING AND WITHOUT ANY NOTICE OTHER THAN SUCH NOTICE AS IS REQUIRED TO BE GIVEN UNDER THE PROVISIONS HEREOF; **THIS MEANS THAT MY FAILURE TO MEET EVERY CONDITION OF THE MORTGAGE LOAN MAY RESULT IN THE LOSS OF MY PROPERTY THROUGH FORECLOSURE,** (2) **WAIVES** ANY AND ALL RIGHTS WHICH GRANTOR MAY HAVE UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, THE VARIOUS PROVISIONS OF THE CONSTITUTION FOR THE SEVERAL STATES, OR BY REASON OF ANY OTHER APPLICABLE LAW, TO NOTICE AND TO JUDICIAL HEARING PRIOR TO THE EXERCISE BY LENDER OF ANY RIGHT OR REMEDY HEREIN PROVIDED TO LENDER, EXCEPT SUCH NOTICE AS IS SPECIFICALLY REQUIRED TO BE PROVIDED HEREOF; (3) ACKNOWLEDGES THAT GRANTOR HAS READ THIS DEED AND SPECIFICALLY THIS PARAGRAPH OF THIS DEED, AND ANY AND ALL QUESTIONS REGARDING THE LEGAL EFFECT OF SAID DEED AND ITS PROVISIONS HAVE BEEN EXPLAINED FULLY TO GRANTOR AND GRANTOR HAS BEEN AFFORDED AN OPPORTUNITY TO CONSULT WITH COUNSEL OF GRANTOR'S CHOICE PRIOR TO EXECUTING THIS DEED; (4) ACKNOWLEDGES THAT ALL WAIVERS OF THE AFORESAID RIGHTS OF GRANTOR HAVE BEEN MADE KNOWINGLY, INTENTIONALLY AND WILLINGLY BY GRANTOR AS PART OF A BARGAINED FOR LOAN TRANSACTION; AND (5) AGREES THAT THE PROVISIONS HEREOF ARE INCORPORATED INTO AND MADE A PART OF THE SECURITY DEED.

READ AND AGREED BY GRANTOR:

Tracie E. Penegar                                        -Grantor

Signed, sealed and delivered in the presence of the two          -Grantor
attesting witnesses

Notary Public                                            -Grantor

(Official Seal)

Unofficial Witness                                       -Grantor

DANNY G SCHULMAN
MY COMMISSION EXPIRES
NOTARY
PUBLIC
NOVEMBER 6, 2015
COBB COUNTY, GA

Waiver of Borrower's Rights Rider                                          10/94
IDS, Inc.

BK: 15292 PG: 3596

# CLOSING ATTORNEY'S AFFIDAVIT

Date:              **October 13, 2015**

Georgia Grantor:   **Tracie E. Penegar**

Lender:            **Stonegate Mortgage Corporation**
                   **9190 Priority Way West Drive, Suite 300**
                   **Indianapolis, IN 46240-1437**
                   **855-663-5100**

## WAIVER OF BORROWER'S RIGHTS

BY EXECUTION OF THIS PARAGRAPH, GRANTOR EXPRESSLY: (1) ACKNOWLEDGES THE **RIGHT TO ACCELERATE** THE DEBT AND THE **POWER OF ATTORNEY** GIVEN HEREIN TO LENDER TO SELL THE PREMISES BY NONJUDICIAL FORECLOSURE UPON DEFAULT BY GRANTOR WITHOUT ANY JUDICIAL HEARING AND WITHOUT ANY NOTICE OTHER THAN SUCH NOTICE AS IS REQUIRED TO BE GIVEN UNDER THE PROVISIONS HEREOF; (2) **WAIVES** ANY AND ALL RIGHTS WHICH GRANTOR MAY HAVE UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, THE VARIOUS PROVISIONS OF THE CONSTITUTION FOR THE SEVERAL STATES, OR BY REASON OF ANY OTHER APPLICABLE LAW TO NOTICE AND TO JUDICIAL HEARING PRIOR TO THE EXERCISE BY LENDER OF ANY RIGHT OR REMEDY HEREIN PROVIDED TO LENDER, EXCEPT SUCH NOTICE AS IS SPECIFICALLY REQUIRED TO BE PROVIDED HEREOF; (3) ACKNOWLEDGES THAT GRANTOR HAS READ THIS DEED AND SPECIFICALLY THIS PARAGRAPH AND ANY AND ALL QUESTIONS REGARDING THE LEGAL EFFECT OF SAID DEED AND ITS PROVISIONS HAVE BEEN EXPLAINED FULLY TO GRANTOR AND GRANTOR HAS BEEN AFFORDED AN OPPORTUNITY TO CONSULT WITH COUNSEL OF GRANTOR'S CHOICE PRIOR TO EXECUTING THIS DEED; (4) ACKNOWLEDGES THAT ALL WAIVERS OF THE AFORESAID RIGHTS OF GRANTOR HAVE BEEN MADE KNOWINGLY, INTENTIONALLY AND WILLINGLY BY GRANTOR AS PART OF A BARGAINED FOR LOAN TRANSACTION; AND (5) AGREES THAT THE PROVISIONS HEREOF ARE INCORPORATED INTO AND MADE A PART OF THE SECURITY DEED.

  READ AND AGREED BY GRANTOR

Signed, Sealed and delivered in the presence of:

_____
                         - Unofficial Witness

_____    Tracie E. Penegar

_____ Notary Public

_____ (Seal)
Tracie E. Penegar          -Grantor

_____ (Seal)
                           -Grantor

# CLOSING ATTORNEY'S AFFIDAVIT

Before the undersigned attesting officer personally appeared the undersigned closing attorney, who, having been first duly sworn according to law, states under oath as follows:

In closing the above loan, but prior to the execution of the Deed to Secure Debt and "Waiver of the Borrower's Rights" by the Borrower(s), I reviewed with and explained to the Borrower(s) the terms and provisions of the Deed to Secure Debt and particularly the provisions thereof authorizing the Lender to sell the secured property by a nonjudicial foreclosure under a power of sale, together with the "Waiver of Borrower's Rights" and informed the Borrower(s) of Borrower's rights under the Constitution of the State of Georgia and the Constitution of the United States to notice and judicial hearing prior to such foreclosure in the absence of a knowing, intentional and willing contractual waiver by Borrower(s) of Borrower's rights. After said review with and explanation to Borrower(s), Borrower(s) executed the Deed to Secure Debt and "Waiver of Borrower's Rights."

Based on said review with and explanation to the Borrower(s), it is my opinion that Borrower(s) knowingly, intentionally and willingly executed the waiver of Borrower's constitutional rights to notice and judicial hearing prior to any such nonjudicial foreclosure.

Sworn to and subscribed before me on the date set forth above.

_Brandi Carter_          Notary Public      Closing Attorney

BRANDI CARTER
MY COMMISSION EXPIRES
NOTARY PUBLIC
PAULDING COUNTY GEORGIA

# FORECLOSURE CLOSING DISCLOSURE

O.C.G.A. Section 7-1-1014(3) requires that we inform you that if you fail to meet any condition or term of the documents that you sign in connection with obtaining a mortgage loan you may lose the property that serves as collateral for the mortgage loan through foreclosure.

Tracie E. Pendgar        10/13/15                                                                                                          
Date                                                            Date

# GEORGIA FORECLOSURE DISCLOSURE

Date:              **October 13, 2015**

Borrower Name(s): **Tracie E. Penegar**

Property Address: **1860 Cedar Cliff Dr SE**
**SMYRNA, GA  30080-5884**

Lender:            **Stonegate Mortgage Corporation**
**9190 Priority Way West Drive, Suite 300**
**Indianapolis, IN  46240-1437**
**855-663-5100**

Georgia law requires that we inform you that if you fail to meet any condition or term of the documents that you sign in connection with obtaining a mortgage loan you may lose the property that serves as collateral for the mortgage loan through foreclosure.

Your acknowledgement below signifies that you have read and understand this disclosure.

_____          10/13/15          _____
Tracie E. Penegar                               Date                                                    Date

BK: **15292** PG: **3598**
REBECCA KEATON
CLERK OF SUPERIOR COURT Cobb Cty. GA.

Deed Book 15607 Page 2178
Filed and Recorded 2/22/2019 1:32:00 PM
2019-0019839
Rebecca Keaton
Clerk of Superior Court
Cobb County, GA
Participant IDs: 5224125492
7067927936

When Recorded Return To:
Home Point Financial Corporation
C/O Nationwide Title Clearing, Inc.
2100 Alt. 19 North
Palm Harbor, FL 34683

## ASSIGNMENT OF SECURITY DEED

**FOR GOOD AND VALUABLE CONSIDERATION,** the sufficiency of which is hereby acknowledged, the undersigned, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR STONEGATE MORTGAGE CORPORATION, ITS SUCCESSORS AND ASSIGNS, (ASSIGNOR), (MERS Address: P.O. Box 2026, Flint, Michigan 48501-2026)** by these presents does convey, grant, assign, transfer and set over the described Security Deed with all interest secured thereby, all liens and any rights due or to become due thereon to **HOME POINT FINANCIAL CORPORATION, WHOSE ADDRESS IS 11511 LUNA ROAD, SUITE 200, FARMERS BRANCH, TX 75234 (317)663-5100, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE).**

Said Security Deed is executed by **TRACIE E PENEGAR** to **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR STONEGATE MORTGAGE CORPORATION, ITS SUCCESSORS AND ASSIGNS** and recorded in Deed **Book 15292 and Page 3583** in the office of the Clerk of the Superior Court of **COBB** County, **Georgia**.

**IN WITNESS WHEREOF,** the undersigned has hereunto set its hand **this 22nd day of February in the year 2019.**
**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR STONEGATE MORTGAGE CORPORATION, ITS SUCCESSORS AND ASSIGNS**

By: _____

**SHANNON MCKINNEY**

**VICE PRESIDENT**

All persons whose signatures appear above have qualified authority to sign and have reviewed this document and supporting documentation prior to signing.

Signed and delivered on the date above and in the presence of:

_____

**ANDRE MIRANDA**

**WITNESS**

STATE OF FLORIDA   COUNTY OF PINELLAS
Sworn to (or affirmed) and subscribed before me, this 22nd day of February in the year 2019, by Shannon McKinney as VICE PRESIDENT for MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR STONEGATE MORTGAGE CORPORATION, ITS SUCCESSORS AND ASSIGNS. He/she is personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument.

_____



MICHELLE BROWN
Notary Public - State of Florida
My Commission #GG 38514
Expires October 13 2020

STATE OF NEW JERSEY
DEPARTMENT OF TREASURY
FILING CERTIFICATION (CERTIFIED COPY)
0100978645

HOME POINT FINANCIAL CORPORATION

I, the Treasurer of the State of New Jersey,
do hereby certify, that the above named business
did file and record in this department the below
listed document(s) and that the foregoing is a
true copy of the
Certificate of Merger
filed in this office
May 31, 2017
as the same is taken from and compared with the
original(s) filed in this office on the date set
forth on each instrument and now remaining on file
and of record in my office.



IN TESTIMONY WHEREOF, I have
hereunto set my hand and affixed
my Official Seal at Trenton, this
31st day of May, 2017

Ford M Scudder
State Treasurer

Certificate Number:    139646131
Verify this certificate online at
https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp

May. 31. 2017 10:30AM

No. 3364

FILED

MAY 3 1 2017

STATE TREASURER

UMC-2 Rev. 3/2013

New Jersey Division of Revenue & Enterprise Services
**Certificate of Merger/Consolidation**
*(Profit Corporations)*

To file electronically:
1. Enter the information requested below and sign by typing your name in the signature field. The form can only be filled in using the free Adobe Acrobat Reader 9.1 or greater. *(See the pages following this form for field by field instructions, and notes on delivery and processing of work requests.)*
2. Click the "Add Attachments" button to add attachments if required *(Check the field by field instructions to see if you must include an attachment(s).*
3. After the form has been filled in properly, please save a copy to your computer so that you can upload the form to the State of New Jersey Division of Revenue & Enterprise Services Central Forms Repository Web application by following the instructions in the next step.
4. Click the "Open the Central Forms Repository Home Page to start the Form Submission Process" button at the bottom of the form. *(This action will launch the State of New Jersey Division of Revenue & Enterprise Services Central Forms Repository Web application. If you have not created an account in the application, you will need to do so before using the online Web application. Once your account is created, please login to the application and follow the instructions for submitting your form and payment online.)*

This form may be used to record the merger or consolidation of a corporation with or into another business entity or entities, pursuant to NJSA 14A. Applicants must insure strict compliance with the requirements of State law and insure that all filing requirements are met. This form is intended to simplify filing with the State Treasurer. Applicants are advised to seek out private legal advice before submitting filings to the Department of the Treasury, Division of Revenue & Enterprise Services office.

1. Type of Filing (check one):      ☒ Merger          ☐ Consolidation

2. Name of Surviving Business Entity: Home Point Financial Corporation

3. Name(s)/Jurisdiction(s) of All Participating Business Entities including Surviving Entity:

| Name      Jurisdiction | Identification # Assigned by (if applicable) |
|---|---|
| Stonegate Mortgage Corporation/Ohio | 0400408519 |
| Home Point Financial Corporation/New Jersey | 0100978645 |

4. Date Merger/Consolidation adopted: 05/31/2017

5. Voting: (all corporations involved; attach additional sheets if necessary)
   -a Corp. Name Stonegate Mortgage Corporation                    Outstanding Shares _____
   If applicable, set forth the number and designation of any class or series of shares entitled to vote.

   Voting For _____          Voting Against _____ ; OR

   Merger/consolidation plan was adopted by the unanimous written consent of the shareholders without a meeting (check) ☒

   -b Corp. Name Home Point Financial Corporation                   Outstanding Shares _____
   If applicable, set forth the number and designation of any class or series of shares entitled to vote. 289,560
                                                                                                            25,107,824

   Voting For _____          Voting Against _____ ; OR

   Merger/consolidation plan was adopted by the unanimous written consent of the shareholders without a meeting (check) ☒

   -c Corp. Name _____                                          Outstanding Shares _____
   If applicable, set forth the number and designation of any class or series of shares entitled to vote.

   Voting For _____          Voting Against _____ ; OR

   Merger/consolidation plan was adopted by the unanimous written consent of the shareholders without a meeting (check) ☐

UMC-2 Rev. 3/2013
Page 2

6. **Service of Process Address** (For use if the surviving business entity is not authorized or registered by the State Treasurer:

The surviving business entity agrees that it may be served with process in this State in any action, suit or proceeding for the enforcement of any obligation of any domestic or foreign corporation, previously amenable to suit in this State, which is a party to this merger/consolidation, and in any proceeding for the enforcement of the rights of a dissenting shareholder of such domestic corporation against the surviving corporation.

The Treasurer is hereby appointed as agent to accept service of process in any such action, suit, or proceeding which shall be forwarded to the surviving business entity at the Service of Process address stated above.

The Surviving Business Entity also agrees that it will promptly pay to the dissenting shareholders of any such domestic corporation the amount, if any, to which they may be entitled under the provisions of Title 14A.

7. **Effective Date** (see inst.):   05/31/2017

| Signature | Name | Title | Date |
|---|---|---|---|
| | William Newman | Home Point Financial Corporation<br>President and Chief Executive Officer | 05/31/2017 |
| | William Newman | Stonegate Mortgage Corporation<br>President and Chief Executive Officer | 05/31/2017 |

**Remember to attach: 1) the plan of merger or consolidation; and 2) if the surviving or resulting business is not a registered or authorized domestic or foreign corporation, a Tax Clearance Certificate for each participating corporation.

| Add Attachments | Open the Central Forms Repository Home Page to start the Form Submission Process |
|---|---|

EXECUTION COPY

## AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER, dated as of May 31, 2017 (the "Merger Agreement"), is entered into by and between Stonegate Mortgage Corporation, an Ohio corporation ("Stonegate"), and Home Point Financial Corporation, a New Jersey corporation ("Home Point"):

### WITNESSETH:

WHEREAS, all of the issued and outstanding shares of stock of Stonegate (the "Stonegate Stock") are held by Home Point;

WHEREAS, Stonegate desires to be merged with and into Home Point;

WHEREAS, the board of directors of Stonegate and the board of directors of Home Point deem it advisable that Stonegate be merged with and into Home Point, and that Home Point continue as the surviving business entity, upon the terms set forth herein and in accordance with the laws of the States of Ohio and New Jersey (the "Merger"), and that the Stonegate Stock be canceled upon consummation of the Merger as set forth herein;

WHEREAS, the board of directors and shareholder of Stonegate and the board of directors and shareholder of Home Point have, by resolutions, duly approved and adopted the provisions of this Merger Agreement as the plan of merger required by (i) Section 17.01.79 of the Ohio Revised Code (the "ORC") and (ii) Section 14A:10-1 of the New Jersey Business Corporation Act (the "NJBCA", and together with the ORC, collectively referred to as the "Governing Law"); and

WHEREAS, the parties intend that the Merger Agreement be treated as a plan of reorganization within the meaning of Section 368 of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder.

NOW, THEREFORE, the parties hereto agree as follows:

### ARTICLE I

### *Effect of the Merger;*
### *Cancelation of Stock*

Section 1.1.    At the Effective Time (as hereinafter defined), Stonegate shall be merged with and into Home Point, the separate corporate existence of Stonegate (except as may be continued by operation of law) shall cease, and Home Point shall continue as the surviving business entity, all with the effects provided by applicable law. Home Point, in its capacity as the surviving business entity of the Merger, is hereinafter sometimes referred to as the "Surviving Business Entity".

Section 1.2.    At the Effective Time, by virtue of the Merger and without any action on the part of the holder of Stonegate Stock, all of the Stonegate Stock which is held immediately prior to the Effective Time shall be cancelled.

KE 46341480.4

Section 1.3.    At and after the Effective Time, the Surviving Business Entity shall possess all the rights, privileges, immunities and franchises, of both a public and private nature, and be subject to all the duties and liabilities of Stonegate; and all rights, privileges, immunities and all property, real, personal and mixed, and all debts due on whatever accounts, including subscriptions to shares, and all other choses in action, and all and every other interest, of or belonging to Stonegate shall be taken and deemed to be transferred to and vested in the Surviving Business Entity without further act or deed; and title to any real estate, or any interest therein, vested in Stonegate, shall not revert or be in any way impaired by reason of the Merger; and the Surviving Business Entity shall thenceforth be responsible and liable for all liabilities and obligations of Stonegate and any claim existing or action or proceeding pending by or against Stonegate may be prosecuted to judgment as if the Merger had not taken place or the Surviving Business Entity may be substituted in its place; all with the effect set forth in the Governing Law. The authority of the officers of Stonegate shall continue with respect to the due execution in the name of each respective company tax returns, instruments of transfer or conveyance and other documents where the execution thereof is required or convenient to comply with any provision of the Governing Law or any contract to which Stonegate was a party or this Merger Agreement.

Section 1.4.    The name of the Surviving Business Entity shall be Home Point Financial Corporation, whose principal place of business is 1194 Oak Valley Drive, Suite 80, Ann Arbor, MI 48108.

## ARTICLE 2

### *Effective Time*

Section 2.1.    Stonegate shall cause a Certificate of Merger to be executed and delivered for filing with the Secretary of State of the State of Ohio, all as provided in and in accordance with the Governing Law (the "OH Certificate"). Home Point and Stonegate shall cause a Certificate of Merger to be executed and delivered for filing with the New Jersey Division of Revenue & Enterprises Services, all as provided in and in accordance with the Governing Law (the "NJ Certificate").

Section 2.2.    The Merger shall become effective upon the filing of the NJ Certificate (the "Effective Time").

## ARTICLE 3

### *Articles of Incorporation and*
### *Bylaws; Board of Directors and Officers*

Section 3.1.    The Certificate of Incorporation of Home Point together with any amendments thereto, as in effect at the Effective Time shall govern the Surviving Business Entity.

Section 3.2.    The Bylaws of Home Point as in effect at the Effective Time, subject to alteration, amendment or repeal from time to time by the Board of Directors or the stockholders of the Surviving Business Entity, shall govern the Surviving Business Entity.

2

Section 3.3.    The members of the board of directors and the officers of Home Point, shall hold the same positions as they held with Home Point immediately prior to the Effective Time and shall hold such offices until the expiration of their current terms, or their prior resignation, removal or death, or as otherwise provided in the Bylaws of the Surviving Business Entity.

## ARTICLE 4

*Miscellaneous*

Section 4.1.    This Merger Agreement may be executed in one or more counterparts, all of which taken together shall constitute one and the same instrument.

Section 4.2.    The internal law, not the law of conflicts, of the States of Ohio and New Jersey will govern all questions concerning the construction, validity and interpretation of this Merger Agreement.

Section 4.3.    This Merger Agreement is not intended to confer upon any person (other than the parties hereto and their respective successors and assigns) any rights or remedies hereunder or by reason hereof.

*         *         *         *         *

May. 31. 2017 10:31AM                                    No. 3764   P. 7

IN WITNESS WHEREOF, the parties hereto have caused this Merger Agreement to be signed by their respective officers thereunto duly authorized, all as of the day and year first written above.

STONEGATE MORTGAGE CORPORATION,
an Ohio corporation

By: _____
Name:  William Newman
Title:   President and Chief Executive Officer

HOME POINT FINANCIAL CORPORATION,
a New Jersey corporation

By: _____
Name:  William Newman
Title:   President and Chief Executive Officer

Form 551 Prescribed by:

**JON HUSTED**
OHIO SECRETARY OF STATE

Toll Free: (877) SOS-FILE (877-767-3453)
Central Ohio: (614) 466-3910
*www.OhioSecretaryofState.gov*
*busserv@OhioSecretaryofState.gov*
File online or for more information: *www.OHBusinessCentral.com*

Mail this form to one of the following:

Regular Filing (non expedite)
P.O. Box 1329
Columbus, OH 43216

Expedite Filing (Two business day processing time.
   Requires an additional $100.00)
P.O. Box 1390
Columbus, OH 43216

# Certificate of Merger
### Filing Fee: $99
### (154-MER)
### Forms Must Be Typed

In accordance with the requirements of Ohio law, the undersigned corporations, banks, savings banks, savings and loan associations, limited liability companies, partnerships, limited partnerships and/or limited liability partnerships, desiring to effect a merger, set forth the following facts

**I. (Surviving) Entity**
A. Name of Entity Surviving the Merger      Stonegate Mortgage Corporation

B. Name Change: As a result of this merger, the name of the surviving entity has changed to the following

(Complete only if name of surviving entity is changing through the merger)

C. The surviving entity is a    **(Please check the appropriate box and fill in the appropriate blanks)**

1.    ☒ **Domestic (Ohio entity)**        ☐ **Foreign (Non-Ohio Entity)**

Jurisdiction of formation

2. **Charter/Registration/License Number**    484059
(If licensed in Ohio as domestic or foreign)

3.    ☒ For-Profit Corporation

☐ Nonprofit Corporation

☐ For-Profit Limited Liability Company

☐ Nonprofit Limited Liability Company

☐ Partnership

☐ Limited Partnership

☐ Limited Liability Partnership

☐ Unincorporated Nonprofit Association

## II. CONSTITUENT ENTITY

Provide the name, Ohio charter/license/registration number, type of entity, jurisdiction of formation, for each entity merging **out of existence. (If this is insufficient space to reflect all merging entities, please attach a separate sheet listing the additional merging entities).**

| Entity Name | Ohio Charter/License/ Registration Number | Jurisdiction of Formation | Type of Entity |
|---|---|---|---|
| Longhorn Merger Sub, Inc. | 3980146 | Ohio | For-Profit C |
| | | | |
| | | | |
| | | | |

## III. MERGER AGREEMENT ON FILE

The name and mailing address of the person or entity from whom/which eligible persons may obtain a copy of the merger agreement upon written request

Matthew Goodman

Name

C/O Home Point Financial Corporation, 1194 Oak Valley Drive, Suite 80

Mailing Address

| Ann Arbor | MI | 48108 |
|---|---|---|
| City | State | Zip Code |

## IV. EFFECTIVE DATE OF MERGER

This merger is to be effective on [05/31/2017]          (The date specified must be on or after the date of the filing. If no date is specified, the date of filing will be the effective date of the merger).

## V. MERGER AUTHORIZED

Each constituent entity has complied with the laws under which it exists and the laws permit the merger. The agreement of merger is authorized on behalf of each constituent entity and each person who signed the certificate on behalf of each entity is authorized to do so.

**VI. STATEMENT OF MERGER**
Upon filing this Certificate of Merger, or upon such later date as specified herein, the merging entity/entities listed
herein shall merge into the listed surviving entity.

**VII. STATUTORY AGENT - To be filed ONLY if the surviving entity is a foreign entity not licensed in Ohio.**
If the surviving entity is a foreign entity **NOT** licensed to transact business in Ohio, provide the name and address
of a statutory agent upon whom any process, notice or demand may be served.

Name

Mailing Address

City                                                              State          Zip Code

**VIII. AMENDMENTS**
If a domestic corporation, limited liability company or limited partnership survives the merger, any
amendments to the entity's articles of incorporation, articles of organization, or certificate of limited partnership
of the surviving domestic entity shall be filed with the certificate of merger.

☐ Amendments are attached                    ☒ No Amendments

**IX. REQUIREMENTS OF CORPORATIONS MERGING OUT OF EXISTENCE**
If a domestic corporation or foreign corporation licensed to transact business in Ohio is a constituent entity
and the surviving entity is not a domestic corporation or foreign corporation to be licensed
in Ohio, the certificate of merger must be accompanied by the affidavits, receipts, certificates, or other evidence
required by division (H) of section 1701.86 division (G) of section 1702.47 of the Revised Code with respect to
each domestic constituent corporation, and/or by the affidavits, receipts, certificates, or other evidence required by
division (C) or (D) of section 1703.17 of the Revised Code with respect to each foreign constituent corporation licensed
to transact business in Ohio.

**X. QUALIFICATION OR LICENSE OF FOREIGN SURVIVING ENTITY**
A surviving foreign entity that wishes to qualify in Ohio as part of the merger must file an additional form, as listed
below, but no additional filing fee is required.

Foreign Qualifying Corporation - Form 530A or B and Certificate of Good Standing
Foreign Notice (if qualifying entity is a foreign bank, savings bank, or savings and loan association) - Form 552
Foreign Qualifying Limited Liability Company - Form 533B
Foreign Qualifying Limited Partnership - Form 531B
Foreign Qualifying Limited Liability Partnership - Form 537 and Evidence of Existence in Jurisdiction of Formation

The undersigned constituent entities (constituent entities include all merging and surviving entities) have caused this certificate of merger to be signed by their duly authorized officers, partners and representatives.

| Stonegate Mortgage Corporation |
Name of entity

By:
Signature

Its: CEO, James Smith
Title

| Longhorn Merger Sub, Inc. |
Name of entity

By:
Signature

Its: President, William Newman
Title

|  |
Name of entity

By:
Signature

Its:
Title

**An authorized representative of each constituent corporation, partnership, or entity must sign the merger certificate (ORC 1701.81(A), 1702.43 (A), 1705.38(A), 1776.70(A), 1782.433(A)). this includes all merging and surviving entities.**

The undersigned constituent entities (constituent entities include all merging and surviving entities) have
caused this certificate of merger to be signed by their duly authorized officers, partners and representatives.

Stonegate Mortgage Corporation

Name of entity

By:

Signature

Its:

Title

Longhorn Merger Sub, Inc.

Name of entity

By:

Signature

President, William Newman

Its:

Title

Name of entity

By:

Signature

Its:

Title

**An authorized representative of each constituent corporation, partnership, or entity must sign the merger certificate
(ORC 1701.81(A), 1702.43 (A), 1705.38(A), 1776.70(A), 1782.433(A)). this includes all merging and surviving entities.**

| DATE:<br>05/31/2017 | DOCUMENT ID<br>201715101192 | DESCRIPTION<br>MERGED OUT OF EXISTENCE (MEX) | FILING<br>.00 | EXPED<br>.00 | PENALTY<br>.00 | CERT<br>.00 | COPY<br>.00 |

### Receipt
This is not a bill. Please do not remit payment.

CT CORPORATION SYSTEM
ATTN: CHRIS RICKARD
4400 EASTON COMMONS WAY SUITE 125
COLUMBUS, OH 43219

# STATE OF OHIO
## CERTIFICATE

### Ohio Secretary of State, Jon Husted
#### 484059

It is hereby certified that the Secretary of State of Ohio has custody of the business records for

**STONEGATE MORTGAGE CORPORATION**

and, that said business records show the filing and recording of:

Document(s)                                      Document No(s):

**MERGED OUT OF EXISTENCE**                      **201715101192**

Effective Date: **05/31/2017**



United States of America
State of Ohio
Office of the Secretary of State

Witness my hand and the seal of the
Secretary of State at Columbus, Ohio
this 31st day of May, A.D. 2017.

*Jon Husted*

Ohio Secretary of State

**\*201715101192\***

| DATE:<br>05/31/2017 | DOCUMENT ID<br>201715101192 | DESCRIPTION<br>MERGER/DOMESTIC (MER) | FILING<br>99.00 | EXPED<br>300.00 | PENALTY<br>.00 | CERT<br>.00 | COPY<br>.00 |
|---|---|---|---|---|---|---|---|

**Receipt**

This is not a bill. Please do not remit payment.

CT CORPORATION SYSTEM
ATTN: CHRIS RICKARD
4400 EASTON COMMONS WAY SUITE 125
COLUMBUS, OH 43219

# S T A T E   O F   O H I O

## C E R T I F I C A T E

### Ohio Secretary of State, Jon Husted

#### 1793758

It is hereby certified that the Secretary of State of Ohio has custody of the business records for

**HOME POINT FINANCIAL CORPORATION**

and, that said business records show the filing and recording of:

Document(s)                                                         Document No(s):

**MERGER/DOMESTIC**                                    **201715101192**

**Effective Date:  05/31/2017**

Witness my hand and the seal of  the
Secretary of State at Columbus, Ohio
this 31st day of May, A.D. 2017.

*Jon Husted*

United States of America
State of Ohio
Office of the Secretary of State

Ohio Secretary of State

| DATE:<br>05/31/2017 | DOCUMENT ID<br>201715101192 | DESCRIPTION<br>MERGED OUT OF EXISTENCE (MEX) | FILING<br>.00 | EXPED<br>.00 | PENALTY<br>.00 | CERT<br>.00 | COPY<br>.00 |

## Receipt

This is not a bill. Please do not remit payment.

CT CORPORATION SYSTEM
ATTN: CHRIS RICKARD
4400 EASTON COMMONS WAY SUITE 125
COLUMBUS, OH 43219

# STATE OF OHIO
## CERTIFICATE

### Ohio Secretary of State, Jon Husted

**484059**

It is hereby certified that the Secretary of State of Ohio has custody of the business records for

**STONEGATE MORTGAGE CORPORATION**

and, that said business records show the filing and recording of:

Document(s)                                          Document No(s):

**MERGED OUT OF EXISTENCE**                          **201715101192**

Effective Date: **05/31/2017**

United States of America
State of Ohio
Office of the Secretary of State

Witness my hand and the seal of the
Secretary of State at Columbus, Ohio
this 31st day of May, A.D. 2017.

*Jon Husted*

Ohio Secretary of State

**\*201715101192\***

| DATE:<br>05/31/2017 | DOCUMENT ID<br>201715101192 | DESCRIPTION<br>MERGER/DOMESTIC (MER) | FILING<br>99.00 | EXPED<br>300.00 | PENALTY<br>.00 | CERT<br>.00 | COPY<br>.00 |
|---|---|---|---|---|---|---|---|

### Receipt

This is not a bill. Please do not remit payment.

CT CORPORATION SYSTEM
ATTN: CHRIS RICKARD
4400 EASTON COMMONS WAY SUITE 125
COLUMBUS, OH 43219

# STATE OF OHIO
## CERTIFICATE

### Ohio Secretary of State, Jon Husted

#### 1793758

It is hereby certified that the Secretary of State of Ohio has custody of the business records for

**HOME POINT FINANCIAL CORPORATION**

and, that said business records show the filing and recording of:

Document(s)                                          Document No(s):
**MERGER/DOMESTIC**                                   **201715101192**

Effective Date: **05/31/2017**

Witness my hand and the seal of the Secretary of State at Columbus, Ohio this 31st day of May, A.D. 2017.

*Jon Husted*

Ohio Secretary of State

United States of America
State of Ohio
Office of the Secretary of State